JOHN P. RICHARDSON ET AL. *v.* ZONING
COMMISSION OF THE TOWN OF
REDDING ET AL.
(AC 28364)

McLachlan, Beach and Pellegrino, Js.

---

Argued January 4—officially released April 15, 2008

*Robert A. Fuller*, for the appellants (defendant Candace R. Benyei et al.).

*Michael N. LaVelle*, for the appellee (named defendant).

*Ward J. Mazzucco*, with whom was *Camille DeGalan*, for the appellees (plaintiffs).

*Opinion*

McLACHLAN, J. The defendants Candace R. Benyei and C. Christian Benyei[1] appeal from the judgment of the trial court sustaining the appeal of the plaintiffs, John P. Richardson and Laurie G. Richardson, from the decision of the zoning commission of the town of Redding (commission) approving the defendants' application to construct an indoor riding arena on their property located at 29 Giles Hill Road in Redding. On appeal, the defendants claim (1) that the court improperly applied the successive application rule when it determined that the commission could not approve a second, revised application to construct the proposed structure after it had denied a prior application involving the same structure and (2) that the commission properly could correct its mistaken denial of their first application because the defendants demonstrated that the proposed structure was a permitted use on their property when the second application was discussed and not an illegal expansion of a nonconforming use. Although we conclude that the court improperly applied the successive application rule in this case, we affirm the trial court's judgment for different reasons.

The following facts and procedural history are relevant to our resolution of the issues in this appeal. The defendants purchased their property, known as Whimsy Brook Farm, in 1972. Although their residence is located on the property, they also have owned and operated an equine facility[2] on their 6.4 acre parcel since 1973.

---

[1] The commission also was named as a defendant in this administrative appeal. It filed an appellate brief, adopting the arguments presented by the Benyeis, although it did not file a petition for certification to appeal. We refer to the Benyeis as the defendants in this opinion.

[2] In the defendants' application to construct an indoor riding arena, Candace Benyei stated that the defendants' operation at Whimsy Brook Farm is an "equine facility."

In connection with that operation, they raise, breed, train and board horses, and they provide private riding lessons on horses owned by them and their boarders. The defendants' property is located in an R-2 residential zone.

In 1986, the commission enacted substantial revisions to its zoning regulations. Pursuant to article V, § 5.14.2 (b), of those amended regulations, a land management plan was required for any "[a]nimal raising operations" in which the number of horses exceeded one horse per 0.8 acres. At that time, the defendants' use of their property became nonconforming as to the number of horses on their 6.4 acre parcel. The amended regulations limited the number to eight, and the defendants kept from twenty to twenty-five horses at Whimsy Brook Farm at any given time.

By letter dated July 5, 2005, Candace Benyei requested permission from the commission to construct a 12,000 square foot indoor riding arena on the defendants' property. In addition to the actual riding ring, the two story corrugated metal building would contain five stalls, bathroom facilities, a tack room, a wash area, a viewing room and storage space. The proposed structure was to be located sixty feet from the boundary line of the plaintiffs, who are abutting property owners. This initial proposal was discussed at meetings of the commission on July 13, August 10, and September 14 and 28, 2005. The commission members also participated in a site walk on the defendants' property on September 21, 2005.

Throughout the proceedings, the plaintiffs expressed their opposition to the defendants' application. Individually and through counsel, they insisted that the defendants' proposed use required the submission and approval of an application for a special permit. At the commission's meeting on September 28, 2005, a letter

from Frank Taylor, the chairman of the commission, who was unable to attend that evening, was read into the record. Taylor concluded that "we should require a full special permit use site plan and land management plan and schedule the required public hearing." After the reading of Taylor's letter, a commission member made the following motion: "Make a motion. Deny this application and move to a special permit process." The motion was seconded and passed unanimously.

By letter dated October 27, 2005, Candace Benyei requested that the commission "put us on the agenda for the meeting on November 9th. We would like to discuss with you a new building project." At the November 9, 2005 meeting, Candace Benyei, the defendants' attorney and the defendants' engineer appeared before the commission. At that time, the defendants submitted a revised plan that included a septic and engineered drainage plan and a package of maps containing twelve pages. The defendants' attorney stated that he wanted to "clarify the status" of the property. He indicated that the primary use of the defendants' property was farming, which is a permitted use in an R-2 zoning district. He further indicated that the proposed structure had been moved more than 100 feet from the plaintiffs' property line. Article V, § 5.14.6 (c), requires that "Major Structures" on a farm, such as the proposed building, be set back 100 feet from all side and rear lot lines. Because the building had been moved to comply with that provision of the zoning regulations, the defendants' attorney argued that it could be constructed as a permitted use. He also argued that the only nonconformity on the property was the number of horses and that the proposed structure did not increase that nonconformity, thereby making it unnecessary for the defendants to apply for a special permit.[3]

---

[3] In fact, Candace Benyei indicated that the defendants intended to reduce the number of horses on their property from twenty-five to twenty when the new building was constructed.

At the conclusion of the defendants' presentation, a commission member made the following motion: "I would make a motion that [the defendants' proposal] does not require a special permit." The motion was seconded and it passed unanimously. The commission then reached the merits of the application and unanimously approved the defendants' site plan. The plaintiffs appealed from the commission's decision to the Superior Court pursuant to General Statutes § 8-8.

In their appeal to the trial court, the plaintiffs claimed that the commission acted illegally, arbitrarily and in abuse of its discretion in approving the defendants' application because, inter alia, it improperly (1) determined that the proposed use did not result in the expansion of an existing nonconforming use, (2) determined that the use proposed did not require a special permit, (3) failed to hold a public hearing before granting the application and (4) reversed its prior decision that the proposal would require an application for a special permit and a land management plan. On August 18, 2006, the court issued its memorandum of decision. It found that the plaintiffs were aggrieved[4] and sustained their appeal on the ground that the commission improperly reversed its initial determination on the first application. Having obtained certification to do so, the defendants filed the present appeal.

I

The defendants claim that the court improperly applied the successive application rule when it determined that the commission could not approve a second, revised application to construct the proposed structure after it had denied a prior application involving the same structure. Specifically, they argue that the second

[4] The court found that the plaintiffs, as abutting property owners, were statutorily aggrieved by the commission's decision. That finding has not been challenged on appeal.

plan was changed substantially in that it brought the proposed structure into compliance with the applicable zoning regulations, thereby allowing the commission to approve the revised site plan.

In its memorandum of decision, the court found as follows: "While an administrative agency may grant a second application following a denial of the first where the second application has been substantially changed to meet the objections the agency has to the original application . . . such is not the case here. . . . [T]he commission, after four meetings and a site walk, specifically found that the structure itself, not its location, was an expansion of a nonconforming use and directed [the defendants] to submit a special permit application so that the scope and impact of the application could be more thoroughly investigated. The plaintiffs relied on that determination and expected that no development would take place in the absence of a special permit application and public hearing. The only change to the renewed application was the relocation of the structure; however, there was no change to its footprint or the fact that it would not replace either of the existing training areas. In the absence of such evidence, the commission acted arbitrarily in approving the second application." (Citation omitted; internal quotation marks omitted.)

We first set forth the applicable standard of review. "Trial courts defer to zoning boards and should not disturb their decisions so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . The trial court should reverse the zoning board's actions only if they are unreasonable, arbitrary or illegal. . . . The burden of proof is on the plaintiffs to demonstrate that the zoning board acted improperly." (Internal quotation marks omitted.) *Vine* v. *Zoning Board of Appeals*, 102 Conn. App. 863, 869, 927 A.2d 958 (2007).

When a party files successive applications for the same property, a trial court's inquiries may vary depending on whether the application before the zoning agency is an application for a variance or an application for a permit. "In considering a subsequent variance application where it has already denied a similar prior one, [a] zoning board of appeals is generally precluded from reversing a prior decision unless there has been a material change of conditions, or other considerations have intervened affecting the merits, and no vested rights have arisen. . . . The board is disallowed from revisiting its prior determination that the requirements for a variance are not present because, if a reversal of that determination was allowed, there would be no finality to the proceeding [and] the result would be subject to change at the whim of members or due to the effect of influence exerted upon them, or other undesirable elements tending to uncertainty and impermanence. . . .

"Finality of decision is just as desirable in the case of an exception [or permit] as in one involving a variance. Because of the nature of an exception [or permit], however, the power of a zoning board to review a prior decision denying the exception [or permit] is not limited, as it is when a variance is sought, to the two situations mentioned above. An additional situation arises when the owner requesting an exception [or permit] files a subsequent application altering the plan under which he previously sought the exception [or permit], in order to meet the reasons for which the board denied the prior one. . . . To justify a special exception [or permit] . . . it must appear that the manner in which the owner proposes to use his property will satisfy the conditions imposed by the regulations. If, therefore, upon a second request for a special exception [or permit], there is a substantial change in the manner of use planned by the owner, the board is faced

with an application materially different from the one previously denied. It may well be that the new plan, by reason of the changes made therein, will succeed, where the former failed, in satisfying the conditions enumerated in the regulations. Under such circumstances, the board is not precluded from granting the second application merely because it has denied the first. . . .

*"A subsequent [permit] application made in order to bring a prior application into compliance with applicable regulations, no matter how minor the work involved may be, is clearly not minor in regard to its significance and effect. . . . The board may grant the exception [or permit] once it finds that all the requirements of the ordinance have been satisfied . . . ."* (Citations omitted; emphasis added; internal quotation marks omitted.) *Grasso* v. *Zoning Board of Appeals,* 69 Conn. App. 230, 244–46, 794 A.2d 1016 (2002). The same concept applies to a site plan application. Id., 246.

In the present case, the court found that the only change between the first and second applications of the defendants was the location of the proposed structure and that the commission, in denying the first application, had "specifically found that the structure itself, not its location, was an expansion of a nonconforming use . . . ." For that reason, the court concluded that the successive application rule applied and that the commission acted arbitrarily in reversing its decision. We disagree with the court's finding and conclusion.

First, in denying the initial application, the commission did not give a collective reason for its decision. Many issues had been discussed at that meeting. Although the chairman stated in his letter that he believed the proposed use constituted an expansion of a nonconforming use, and similar comments were made by other individuals during that meeting, the commission denied the application without stating its reasons

on the record. "[M]ere utterances of an individual member do not constitute a formal, official collective statement of the entire board." *Vine* v. *Zoning Board of Appeals*, supra, 102 Conn. App. 870 n.2.

Second, we conclude that the court improperly substituted its judgment for that of the commission. Because no official collective statement was provided for the commission's denial of the defendants' first application, the court should have searched the entire record to find a basis for the commission's decision. Id., 870. In addition to the discussion that the proposed structure might be an illegal expansion of a preexisting, nonconforming use, other comments were made by the commission members and members of the public as to the failure of the structure to meet the 100 foot setback requirement in the regulations. The first application located the structure sixty feet from the plaintiffs' boundary line. The second application moved the building to a location more than 100 feet from the plaintiffs' boundary line. If, as argued by the defendants' attorney, the revised application then satisfied all of the requirements for the use of that building, the commission was entitled to review the subsequent application and approve the site plan.

"The function of the [trial] court on review is not to reach its own conclusions upon subordinate facts but only to determine whether the conclusion of the commission on those facts was unreasonable or illogical." *Hoffman* v. *Kelly*, 138 Conn. 614, 617, 88 A.2d 382 (1952). We cannot conclude that the commission's decision to review the revised application was unreasonable or illogical when there is a basis in the record to find that the change in location was made in order to bring the proposal into compliance with the regulations. Accordingly, the court improperly concluded that the successive application rule prevented the commission from considering the revised application of the defendants.

## II

Although the commission properly could consider the subsequent plan, we nevertheless affirm the court's judgment because the commission's determination that the defendants were not required to submit an application for a special permit was clearly contrary to the zoning regulations.

At the meeting at which the defendants' revised application was discussed, the defendants' attorney told the commission members that the primary use of the property was for farming and that the proposed structure was, therefore, a permitted use in an R-2 zoning district. Article IV, § 4.2.1, of the regulations lists the permitted uses in residential zones. In addition to detached single-family dwellings, permitted principal uses include "[f]arming, forestry and horticulture, as provided by section 5.14." Article V, § 5.14.6 (c), entitled "[m]ajor [s]tructures," provides that "[a]ny barn, greenhouse, shed, structure or group of structures exceeding 2,500 square feet in gross ground coverage shall be set back at 100 feet from all side and rear lot lines, or effectively screened as required to protect adjacent properties." Because the revised plan located the proposed structure more than 100 feet from the plaintiffs' boundary line, the defendants argued that no special permit was required because the application complied with the regulations for a major structure on property used primarily for farming.

Some of the commission members questioned whether the defendants' property was being used primarily for farming and whether the proposed structure was incidental to a farming use. The defendants' attorney referred to the statutory definition of farming set forth in General Statutes § 1-1 (q)[5] to support their position. Neither the commission members nor the defendants' attorney referred to the definition of "farming"

[5] General Statutes § 1-1 (q) provides in relevant part: "[T]he words 'agriculture' and 'farming' shall include cultivation of the soil, dairying, forestry,

in the town's zoning regulations. Article VIII, § 8.1.64, defines "farming" as "[t]he cultivation of open land for growing of crops, hay, fodder, ensilage, pasturage, orchards, gardens, nursery stock, and related agricultural production, including the incidental raising of domestic animals and the sale of agricultural products directly resulting from such cultivation, within limits prescribed by these [r]egulations . . . ." Without discussing the definition of "farming" as found in its own zoning regulations, the commission agreed with the defendants that no special permit was required for their proposal and approved the site plan submitted for the construction of the indoor riding arena.

The court never reached the issue of whether the defendants' proposed structure was incidental to a permitted farming use, as claimed by the defendants, or whether the addition of an indoor riding arena to the property was an illegal expansion of a nonconforming use, as claimed by the plaintiffs.[6] We consider this issue

---

raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training and management of livestock, including horses, bees, poultry, fur-bearing animals and wildlife, and the raising or harvesting of oysters, clams, mussels, other molluscan shellfish or fish; the operation, management, conservation, improvement or maintenance of a farm and its buildings, tools and equipment . . . . Nothing herein shall restrict the power of a local zoning authority under chapter 124."

[6] At the time the defendants' first application was being considered, the plaintiffs and some of the commission members stated their concerns that the defendants' property was being used for business purposes. It was acknowledged that the defendants' property had been used for the raising and boarding of horses since 1973. Comments were made that some of the current uses of the property might be valid preexisting, nonconforming uses but that the proposed structure would be an illegal expansion of those nonconforming uses.

The plaintiffs and various commission members stated that the defendants would be required to submit an application for a special permit if their proposal constituted an expansion of a valid nonconforming use. The regulations, however, do not permit the expansion of a nonconforming use, with or without the issuance of a special permit. Article V, § 5.17.3, provides that "[a]ny lawful use of land or lawful use of a building or [s]tructure, which use, however, does not comply with the permitted uses or permitted special uses specified by these Regulations for the Zone in which it is located, is a *nonconforming use*."

because its resolution involves the interpretation of the zoning regulations, which presents a question of law. See *Thomas* v. *Planning & Zoning Commission*, 98 Conn. App. 742, 745, 911 A.2d 1129 (2006). This court can decide a question of law notwithstanding the fact that the trial court did not address it. Cf. *Colangelo* v. *Heckelman*, 279 Conn. 177, 194 n.16, 900 A.2d 1266 (2006).[7]

"Because the interpretation of the regulations presents a question of law, our review is plenary. . . . [Z]oning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language [or . . . the relevant zoning regulation] as applied to the facts of the case, including the question of whether the language does so apply." (Internal quotation marks omitted.) *Trumbull Falls, LLC* v. *Planning & Zoning Commission*, 97 Conn. App. 17, 21–22, 902 A.2d 706, cert. denied, 280 Conn. 923, 908 A.2d 545 (2006). Although a commission's interpretation of its regulations is entitled to some deference, we are not bound by its legal interpretation. See *Northeast Parking, Inc.* v. *Planning & Zoning*

"No nonconforming use shall be expanded or enlarged beyond the extent of building size, floor space and site area it occupied on the effective date of these Regulations, or pertinent amendments thereto.

"No nonconforming use may be changed except to a use which is permitted by these Regulations for the Zone in which the use is located or to another nonconforming use less intensive in nature and more consistent with the uses permitted in the Zone in which the building, structure or site area, is located, as determined by the Commission."

[7] Further, it is appropriate to address this issue because the defendants have claimed on appeal that the commission properly could correct its mistaken denial of their first application because they demonstrated at the meeting on their second application that the proposed structure was a permitted use under the regulations and that no special permit was required.

*Commission*, 47 Conn. App. 284, 293, 703 A.2d 797 (1997), cert. denied, 243 Conn. 969, 707 A.2d 1269 (1998).

As we previously noted, farming is a permitted use in an R-2 zoning district. Contrary to the defendants' argument, however, their property is not used primarily for farming. The definition of "farming" in the town's zoning regulations is controlling.[8] According to article VIII, § 8.1.64, farming is "[t]he cultivation of open land" and "includ[es] the incidental raising of domestic animals . . . ."[9] Although the defendants reside at Whimsy Brook Farm, it is undisputed that the primary use of the property has been the raising, breeding, training and boarding of horses since 1973. Candace Benyei, in the defendants' first application, described the operation as an "equine facility." It cannot reasonably be argued that the raising of horses on the defendants' property is incidental to the cultivation of their land so as to fall within the definition of "farming" in the regulations.

Although we conclude that the defendants' use of their property is not primarily for farming, we do not agree with the plaintiffs' argument that the defendants' proposal necessarily involves the expansion of a nonconforming use. A nonconforming use is defined in article V, § 5.17.3, as "[a]ny lawful use of land or lawful use of a building or [s]tructure, which use, however,

---

[8] The statutory definition of "farming" in § 1-1 (q) does not apply to the present case because that term is expressly defined in the applicable regulations. See *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 705, 784 A.2d 354 (2001).

[9] The definitional differences between the Redding zoning regulations and the Middletown zoning regulations distinguish this case from the recently decided case of *Borrelli* v. *Zoning Board of Appeals*, 106 Conn. App. 266, 941 A.2d 966 (2008). In Middletown, the definition of "farming or other agricultural uses" included "animal husbandry"; id., 275–76; whereas in Redding, "farming" included only the "incidental raising of domestic animals."

does not comply with the permitted uses or *permitted special uses* specified by these Regulations for the Zone in which it is located . . . ." (Emphasis added.) Although the defendants' equine facility is not a permitted use in an R-2 zoning district, the operation does fall within the enumerated permitted special uses for residential zones set forth in article IV, § 4.2.3. Section 4.2.3 (j) authorizes the establishment of "[l]ivery stables, riding academies, livestock farms, and forest sawmills, subject to the provisions of Section 5.14," upon the granting of a special permit by the commission. Section 5.14 is entitled "[f]arms, [p]roduce [s]tands, [a]nimal [o]perations," and includes horses under the category of "[a]nimal raising operations . . . ." Even though the term "livestock farms" is not expressly defined in the regulations, a reading of the applicable sections of those regulations leads to the conclusion that the raising of horses is a permitted special use under § 4.2.3 (j), as further clarified by § 5.14.[10]

The defendants' use of their property was established before a special permit for "livestock farms" was required. Nevertheless, any enlargement of that use is subject to the requirements set forth in the current regulations. Article V, § 5.1, entitled "[p]ermitted [s]pecial [u]ses," provides: "Special uses, as permitted within the respective zones, are unique in character and require that each application be considered on its individual merits. A use subject to Special Permit shall not be established, *altered* or enlarged until specific findings and approval have been made by the Zoning Commission under the following regulations." (Emphasis added.) The provisions that follow are comprehensive and require, inter alia, the submission of a special permit application with a complete site plan. Section

[10] Under the zoning regulations of the town of Redding, a "livestock farm," as a permitted special use, may be the principal use of the property and coexist with a residence. See *Lauer* v. *Zoning Commission*, 220 Conn. 455, 466, 600 A.2d 310 (1991).

5.1.2 sets forth the procedure for submission of the application and requires the commission to hold a public hearing and to send notice of that hearing by certified mail to each abutting property owner.

Because the term "alter" is not defined in the zoning regulations, we look to the commonly accepted meaning of the word. In Webster's Third New International Dictionary, "alter" is defined as follows: "[T]o cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else." The plaintiffs and other members of the public voiced concerns at the meeting on the first application that the defendants' proposed structure would, inter alia, require its own septic system because of the bathroom and wash area, could adversely impact the drainage in the area and could result in increased truck and trailer traffic.

We conclude that the defendants' permitted special use of its property would be altered by the construction of a 12,000 square foot indoor riding arena, and, therefore, it was necessary under the zoning regulations for the defendants to submit an application for a special permit and for the commission to hold a public hearing on that application. For that reason, the appeal of the plaintiffs from the decision of the commission was properly sustained.

The judgment is affirmed.

In this opinion the other judges concurred.