******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

JACK E. TUREK ET AL. *v.* ZONING BOARD
OF APPEALS FOR THE CITY OF MILFORD
(AC 41824)

Alvord, Devlin and Pellegrino, Js.

*Syllabus*

The defendant zoning board of appeals appealed from the judgment of the
trial court sustaining the appeal filed by the plaintiff landowners. After
a hurricane destroyed their home, the plaintiffs sought to construct a
new home on their property. The plaintiffs filed an application for a
variance from the building height requirements of certain zoning regula-
tions. The board denied the application, and the plaintiffs appealed to
the trial court, alleging that the board acted illegally, arbitrarily and in
abuse of its discretion by ignoring certain legal hardships unique to the
property. The trial court sustained the plaintiffs' appeal, concluding that
the plaintiffs demonstrated an unusual hardship on the basis of the
destruction of their previous home and the need to comply with applica-
ble federal and state flood elevation requirements, and that their pro-
posal qualified under the narrow exception to the hardship requirement
set forth in *Adolphson* v. *Zoning Board of Appeals* (205 Conn. 703),
because the proposed house would reduce nonconformities in relation
to the previous house. Thereafter, this court granted the board's petition
for certification to appeal to this court, and this appeal followed. *Held*:
1. The trial court incorrectly concluded that the plaintiffs demonstrated a
    legally cognizable hardship: an applicant for a variance must show that,
    because of some peculiar characteristic of his property, a strict applica-
    tion of the zoning regulation would produce an undue hardship, and
    the plaintiffs here failed to carry their burden of demonstrating a legally
    cognizable harship as the record of the proceedings before the board
    contained no evidence of hardship originating in the zoning ordinance
    because the evidence merely established that the plaintiffs could not,
    in the absence of a variance, build the type of house that they desired
    while conforming to flood elevation requirements; although the plain-
    tiffs' proposed home did not increase substantially the square footage
    when compared to their prior home, the plaintiffs' alleged hardship
    arose out of their desire to build a certain type of home, which was
    appropriately characterized as personal disappointment.
2. The trial court erroneously determined that the plaintiffs' proposal quali-
    fied under the *Adolphson* exception to the hardship requirement:
    although the plaintiffs argued that the board should have granted a
    variance because it would reduce other nonconformities, the plaintiffs'
    proposed new construction would create a height nonconformity where
    none previously existed, and the plaintiffs provided this court with no
    authority suggesting that the board was required to grant the requested
    variance from the height limitation, which would create a new noncon-
    formity, on the basis of a proposed reduction or elimination of other
    nonconformities and compliance with flood regulations.

Argued November 18, 2019—officially released February 25, 2020

*Procedural History*

Appeal from the decision of the defendant denying
the plaintiffs' application for a variance from the city
of Milford's zoning regulations, brought to the Superior
Court in the judicial district of Hartford, Land Use Liti-
gation Docket, and tried to the court, *Hon. Marshall
K. Berger*, judge trial referee; judgment sustaining the
appeal, from which the defendant, on the granting of
certification, appealed to this court. *Reversed; judg-
ment directed.*

*Kevin J. Curseaden*, for the appellees (plaintiffs).

*Matthew B. Woods*, for the appellant (defendant).

*Opinion*

ALVORD, J. The defendant, the Zoning Board of Appeals of the City of Milford (board), appeals from the judgment of the trial court sustaining the appeal filed by the plaintiffs, Jack E. Turek and Donna Weaver, and reversing the decision of the board that the plaintiffs were not entitled to a variance. On appeal, the board claims that the trial court erroneously sustained the appeal, and causes us to consider (1) whether the plaintiffs demonstrated a legally cognizable hardship, and (2) whether the plaintiffs' proposal qualifies under the exception to the hardship requirement set forth in *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 710, 535 A.2d 799 (1988), and its progeny.[1] We reverse the judgment of the trial court.

The relevant facts and regulatory background are as follows. The plaintiffs own property located at 59 Hillside Avenue in Milford (property). The property measures approximately 4076 square feet and is situated between Long Island Sound to the east and Hillside Avenue to the west. The property, which is narrow in shape,[2] slopes downward from 13 feet above sea level at Hillside Avenue to between 8.3 and 8.9 feet above sea level at the shore. The property was originally created in 1901. The city of Milford (city) first enacted zoning regulations (regulations) in 1930. The property is located within the R-5 residential zone. The regulations require a minimum of 5000 square feet of land on each building lot located in an R-5 zone.[3] See Milford Zoning Regs., art. III, § 3.1.4.1. Accordingly, the lot is a legal nonconforming lot. See Milford Zoning Regs., art. XI, § 11.2. The regulations also specify that in an R-5 zone the maximum building height permitted is thirty-five feet and the maximum lot coverage permitted is 65 percent. Milford Zoning Regs., art. III, § 3.1.4.1. Building height is defined in the regulations in part as "[t]he vertical distance measured in feet from the average existing level of the ground surrounding the building or addition thereto and within ten (10) feet thereof up to the midpoint height of a pitched roof or up to the level of the highest main ridge or peak of any other type of structure, or the total number of stories in a building including basements and/or half-stories."[4] Milford Zoning Regs., art. XI, § 11.2. "Building Height Within A Flood Hazard Area" is separately defined in the regulations as "[t]he building height as defined above, but including all portions of a building situated below the regulatory flood protection elevation and all portions of basements or cellars that extend above the finished grade adjacent to the building." Milford Zoning Regs., art. XI, § 11.2. The average elevation of the property is 10 feet and 8.4 inches above sea level.

Prior to Hurricane Sandy in late October, 2012, there existed on the property a single-family residence. The two-story residence, which was more than 100 years

old, measured 1500 square feet. There were two other structures, a detached garage and a shed, on the property. Hurricane Sandy destroyed the residence, which was later demolished, and since that time the lot has remained vacant.

The entire property, which is split between the AE Flood Zone and the VE Flood Zone, is within a special flood hazard area. The regulations incorporate by reference the areas of special flood hazard identified by the Federal Emergency Management Agency (FEMA) and the accompanying Flood Insurance Rate Maps (FIRM).[5] Milford Zoning Regs., art. V, § 5.8.2.[6] The Code of Federal Regulations (code) defines "[a]rea of special flood hazard" in relevant part as "the land in the flood plain within a community subject to a 1 percent or greater chance of flooding in any given year. . . ." 44 C.F.R. § 59.1. The regulations also identify the VE Flood Zone as a coastal high hazard area. Milford Zoning Regs., art. V, § 5.8.2, and art. XI, § 11.2. The code defines "coastal high hazard area" as "an area of special flood hazard extending from offshore to the inland limit of a primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources." 44 C.F.R. § 59.1; see also Milford Zoning Regs., art. XI, § 11.2 (containing similar definition and stating that "[t]he area is designated on a FIRM as Zone VE or V").

The regulations provide that "[a]reas of special flood hazard are determined utilizing the base flood elevations (BFE) provided on the flood profiles in the Flood Insurance Study (FIS)[7] for a community. BFEs provided on a [FIRM] are only approximate (rounded up or down) and should be verified with the BFEs published in the FIS for a specific location." (Footnote added). Milford Zoning Regs., art. V, § 5.8.2. "Base flood" is defined in both the code and the regulations as "the flood having a one percent chance of being equaled or exceeded in any given year." 44 C.F.R. § 59.1; see also Milford Zoning Regs., art. XI, § 11.2. "Base flood elevation" is defined in the regulations as "[t]he elevation of the crest of the base flood or 100-year flood. The height in relation to mean sea level expected to be reached by the waters of the base flood at pertinent points in the floodplains of coastal and riverine areas."[8] Milford Zoning Regs., art. XI, § 11.2. The base flood elevation for both the AE Flood Zone and VE Flood Zone where the property is located is thirteen feet.

The National Flood Insurance Program, administered by FEMA, "makes federal flood insurance available to communities that impose a minimum standard of floodplain management regulation, generally imposed through zoning ordinances. Every Connecticut municipality participates in the [program]. . . . Under the [program], participating municipalities *must* create land use ordinances that *require* habitable portions of

new *or substantially improved* residential structures within the Special Flood Hazard Area to be elevated to or above the Base Flood Elevation . . . shown on Flood Insurance Rate Maps . . . ." (Emphasis in original; internal quotation marks omitted.) *Mayer-Wittmann* v. *Zoning Board of Appeals*, 333 Conn. 624, 635, 218 A.3d 37 (2019), quoting W. Rath et al., "Height Restrictions on Elevated Residential Buildings in Connecticut Coastal Floodplains," Municipal Resilience Planning Assistance Project: Law & Policy White Paper Series (2018) p. 2, available at https://circa.uconn.edu/wp-content/uploads/sites/1618/2018/03/Height-Restrictions-on-Elevated-Buildings.pdf (last visited February 18, 2020). Specifically, the code requires that "all new construction and substantial improvements of residential structures within Zones A1–30, AE and AH zones on the community's FIRM have the lowest floor (including basement) elevated to or above the base flood level . . . ." 44 C.F.R. § 60.3 (c) (2). Under the regulations, the board may not accept any application to perform new construction of a residence "with a lowest floor elevation below the regulatory flood protection . . . ." Milford Zoning Regs., art. IX, § 9.2.3 (3). Additionally, § 25-68h-2 of the Regulations of Connecticut State Agencies, addressing floodplain management standards, requires an additional one foot of freeboard,[9] specifically mandating that new structures designed for human habitation located within the floodplain be "elevated with the lowest floor one foot above the level of the base flood."

With that factual and regulatory background in mind, we turn to the procedural history of the present case. After Hurricane Sandy destroyed their home, the plaintiffs sought to construct a new home on the vacant property. On May 26, 2015,[10] the plaintiffs filed an application for variances from the building height and setback requirements of the regulations[11] and submitted plans for the proposed residence. The proposed 1600 square foot house would be four stories, with a garage located on the lowest level and storage and utilities located on the highest level. The proposed house would be set further back from Long Island Sound than the previous house and would be entirely removed from the VE Flood Zone. It also would cover less of the lot than the previous structures.

As noted previously, building height as provided for in the regulations is measured from "the average existing level of the ground surrounding the building," in this case, 10 feet and 8.4 inches above sea level, to the midpoint of the pitched roof. Milford Zoning Regs., art. XI, § 11.2. As the trial court noted, were the proposed house not required to be elevated, the proposed building, when measured from the average elevation to the midpoint of the pitched roof, would have been 34 feet and 11.5 inches high. FEMA regulations, however, require residences in an AE-13 Flood Zone to be ele-

vated to base flood elevation (thirteen feet above mean sea level), and state regulations require an additional one foot of freeboard. See footnote 9 of this opinion. With the base of the proposed building located at fourteen feet above sea level, the proposed house, when measured from the average elevation, would be 38 feet and 3.1 inches high. Thus, the plaintiffs sought a variance from the thirty-five foot height restriction.

The board held a public hearing on the plaintiffs' application on June 9, 2015. Counsel for the plaintiffs summarized the claimed hardship, including the topography of the property and applicable federal and state elevation requirements. He highlighted other communities' amendments to zoning regulations to take into account base flood elevations in determining building height. He also argued that the proposed house would reduce nonconformities in relation to the previous house and submitted photographs of neighboring properties in support of his argument that the proposed house would not be out of character. Three neighboring residents spoke in opposition to the application, and four written statements of opposition were received. Following the conclusion of the public hearing, the board held the following discussion:

"Chairman [Joseph Tuozzola]: Okay, this hearing's closed. What are your thoughts, lady and gentlemen?

"[Board member Sarah] Ferrante: We did hear tonight that the slope of the land is similar to the others in the neighborhood so it's not really a unique lot in that regard and what applies here would apply to all is something to consider.

"[Board member Howard] Haberman: Yeah, I think what I struggle with is the fact that the property and the way that the grade, mean grade is measured in our, by the regs, it doesn't just affect this particular lot, it affects a lot of lots down there on the shoreline and in granting this variance for that height we're in essence amending the regulations and I don't think that's the purpose of this Board. If it were just [this] particular . . . lot alone, then I get it, there's a peculiarity, a hardship but I think it extends beyond just this lot and I think again, by granting that piece of the variance, the request would be, in essence, amending the regs and I don't think, again, I don't think that's the purpose of this board.

"[Tuozzola]: Mr. Soda.

"[Board member William] Soda: Well, I kind of feel the same way, it's not unique to this lot, the contours on the adjacent lots, and, I mean, as bad as I feel for these people and would love to see them get their house going, I mean, you know, I can't see it.

"[Tuozzola]: Yeah, I'm also sorry that this has been going on so long and, you know, but I do again feel that because it's a new house there are ways to adjust

this and we can't speculate on how the regulations or variances might change. So, right now we know what's in front of us and we can debate what the actual house, height of the house would be and we're saying the height might be different because the house is built in a lower spot so that's what's really changing it, but I think there's still room for improvement here. Any other comments? I need [a] motion.

"[Haberman]: I have a question about the motion in terms of the other part of the application, obviously I have no problem with the other variances they have requested because given the size of the lot it's okay to approve, so I'm wondering whether without prejudice again or do we split the vote, split the—

"[Tuozzola]: All right so what you're saying, do you want to split some things on here and allow some variances."

"[Haberman]: Or deny [without] prejudice to give them the opportunity.

"[Soda]: Well what if we give them the other variances, then if they conform to the height they can, is that possible Stephen.

"[Zoning Enforcement Officer Stephen] Harris: It's unusual but possible, you can grant some variances but not others.

"[Tuozzola]: Well the height is really the issue, so I don't know how we can do the other things without addressing that. How are you going to start building a house with the variances and the height is still not addressed. It's still going to be up for debate.

"[Ferrante]: I'm also hesitant to grant some variance and not to grant some variances without [an] overall plan, we're allowing something without knowing what we're getting at that point.

"[Soda]: We would know what we're getting except for the height.

"[Ferrante]: Right, I mean, but it is a brand new house and it could be redesigned another way.

"[Haberman][12]: I guess Mr. Haberman's questions was how many times can you deny without prejudice, again, I would think you could.

"[Harris]: That's up to the board. You can deny with waivers to reapply as often as you would like.

"[Haberman]: I move to make a motion to deny without prejudice.

"[Soda]: I'll second that.

"[Haberman]: Reason for the motion obviously the height is an issue for us but other parts of the application are okay, there's room to change the application." (Footnote added.)

The board then unanimously voted to deny the plaintiffs' requested variances. The plaintiffs filed an appeal of that decision with the trial court. In their July 2, 2015 complaint, the plaintiffs alleged, inter alia, that the board, in denying the requested variances, acted illegally, arbitrarily, and in abuse of its discretion when it ignored evidence on the record of hardship that FEMA, state, and local regulations require residences in an AE-13 Flood Zone to be built at thirteen feet above mean sea level plus an additional one foot of freeboard,[13] and that the FEMA and state regulations "do not account for how building height is measured in the regulations." They further alleged that the board ignored evidence of the legal hardships unique to the property, including the elevation of the property, which situated it across the AE 13 and VE 13 Flood Zones; the narrow width of the property, having only 35.6 feet of frontage where fifty feet is required; the location of the property bordering Long Island Sound; and the topography of the property, in that it slopes downward from the street to the shore. The plaintiffs also alleged that the board failed to consider evidence that "overall nonconformities on the property would be reduced if the application were approved . . . ."

After receiving the parties' written briefs, the court held a hearing on the matter on August 9 and December 5, 2017. In its April 4, 2018 memorandum of decision, the court found that the requested variance would not "negatively [impact] the comprehensive plan." Specifically, the court concluded that "the board's denial based solely upon the aesthetic height requirement—which the plaintiffs' proposed structure arguably meets—does not consider the nuances and immediacy of flood hazard or sea level rise and the elevation requirements in the plan and is thus contrary to law and logic." Turning to the hardship requirement, the court found that the plaintiffs had established unusual hardship, which was not self-imposed, on the basis of "the total destruction of the previous home by Hurricane Sandy and the need to comply [with] applicable elevation requirements." It further concluded that the plaintiffs' proposal qualified under the narrow exception to the hardship requirement set forth in *Adolphson* v. *Zoning Board of Appeals*, supra, 205 Conn. 710, in that the proposed house would reduce nonconformities. For those reasons, the court sustained the plaintiffs' appeal. The board thereafter filed a petition for certification to appeal. This court granted the petition, and this appeal followed.

Before turning to the claims on appeal, we set forth the applicable law governing variances and our scope and standard of review. General Statutes § 8-6 authorizes municipal zoning boards of appeals, inter alia, to "vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent and with due consideration for conserving

the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured, provided that the zoning regulations may specify the extent to which uses shall not be permitted by variance in districts in which such uses are not otherwise allowed."

"[A] variance constitutes authority extended to the owner to use his property in a manner forbidden by the zoning enactment. . . . It is well established . . . that the granting of a variance must be reserved for unusual or exceptional circumstances. . . . An applicant for a variance must show that, because of some peculiar characteristic of his property, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has on other properties in the zone. . . . Accordingly, we have interpreted . . . § 8-6 to authorize a zoning board of appeals to grant a variance only when two basic requirements are satisfied: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. . . . Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a zoning variance." (Citation omitted; internal quotation marks omitted.) *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 678–79, 111 A.3d 473 (2015).

In reviewing a decision of a zoning board of appeals, "[c]ourts are not to substitute their judgment for that of the board . . . and decisions of local boards will not be disturbed so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . Upon appeal, the trial court reviews the record before the board to determine whether it has acted fairly or with proper motives or upon valid reasons. . . . We, in turn, review the action of the trial court. . . . The burden of proof to demonstrate that the board acted improperly is upon the [plaintiff]." (Internal quotation marks omitted.) *Mayer-Wittmann* v. *Zoning Board of Appeals*, supra, 333 Conn. 639; see also *Richardson* v. *Zoning Commission*, 107 Conn. App. 36, 42, 944 A.2d 360 (2008) ("Trial courts defer to zoning boards and should not disturb their decisions so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . The trial court should reverse the zoning board's actions only if they are unreasonable, arbitrary or illegal." (Internal quotation marks omitted.)). "Because the plaintiffs' appeal to the trial court

is based solely on the record, the scope of the trial court's review of the board's decision and the scope of our review of that decision are the same." (Internal quotation marks omitted.) *Mayer-Wittmann* v. *Zoning Board of Appeals*, supra, 639.[14]

In order to determine whether the board properly denied the subject variance, we first must consider whether the board gave reasons for its action. "It is well settled that [w]hen a zoning board states the reasons for its action, the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations which the commission is required to apply under the zoning regulations. . . . The court should not go behind the official statement of the board. . . . In the *absence* of a statement of purpose by the zoning [agency] for its actions, it [is] the obligation of the trial court, and of this court upon review of the trial court's decision, to search the entire record to find a basis for the [agency's] decision. . . . Our inquiry begins, therefore, with the question of whether the board rendered a formal, official, collective statement of the reasons for its action. . . .

"That analysis is guided by certain established precepts. First, individual reasons given by certain members of the [zoning agency do] not amount to a formal, collective, official statement of the [agency] . . . and are not available to show the reason[s] for, or the ground[s] of, the [zoning agency's] decision. . . . Second, the remarks of a board member in moving to grant a variance do not constitute a collective statement of the basis for the board's action. . . . Third, it is not appropriate for a reviewing court to attempt to glean such a formal, collective statement from the minutes of the discussion by . . . members *prior to the* [*zoning agency's*] *vote.* . . .

"Fourth, our Supreme Court has explained that the cases in which [it] held that the agency rendered a formal, official, collective statement involve circumstances wherein the agency *couples its communication of its ultimate decision with express reasons behind that decision.*" (Citations omitted; emphasis in original, footnote omitted; internal quotation marks omitted.) *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 672–74.

In reviewing the meeting minutes, as set forth previously, we note that, although certain individual board members offered their thoughts on whether the plaintiffs had established a hardship prior to voting on the application, that discussion does not constitute a formal, official, collective statement of reasons for its action. See *Amendola* v. *Zoning Board of Appeals*, 161 Conn. App. 726, 736, 129 A.3d 743 (2015) ("although board members discussed the characteristics of the property and conditions for granting the proposed vari-

ances, the record does not contain a collective statement of the board's reasons for granting the variances"). Board member Haberman's statement, in moving to deny the application, that "obviously the height is an issue for us," which the trial court relied on as forming an official reason for the decision, is likewise not sufficient. See *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 674 ("the remarks of a board member in moving to grant a variance do not constitute a collective statement of the basis for the board's action"); see also *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 208–209, 209 n.12, 658 A.2d 559 (1995) (board's discussion of reasons supporting variance before vote and chairman's remarks in moving to grant variance did not constitute collective statement of basis for board's decision granting variance). Accordingly, we must search the record as a whole to determine whether the evidence supports the board's decision to deny the subject variance.

I

The board's first claim on appeal is that the court erroneously concluded that the plaintiffs had established a hardship. The board maintains that the hardship claimed by the plaintiffs was self-created because "if the plaintiffs eliminated one story in the new structure, or otherwise reduced the structure's height by 4.5 feet, they would not need a height variance." We agree with the board that the plaintiffs failed to establish the existence of a legally cognizable hardship and the trial court erred in concluding to the contrary.

As noted previously, "[a] variance constitutes permission to act in a manner that is otherwise prohibited under the zoning law of the town. . . . It is well established, however, that the granting of a variance must be reserved for unusual or exceptional circumstances. . . . An applicant for a variance must show that, because of some peculiar characteristic of his property, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has on other properties in the zone. . . . Accordingly, we have [concluded that a zoning board of appeals may] grant a variance only when two basic requirements are satisfied: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. . . . Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a zoning variance. . . . Zoning boards of appeals are authorized to grant variances in cases in which enforcement of a regulation would cause unusual hardship in order to [furnish] elasticity in the application of regulatory measures so that they do not operate in an arbitrary or confiscatory and, consequently, unconstitutional

. . . manner." (Citation omitted; internal quotation marks omitted.) *Mayer-Wittmann* v. *Zoning Board of Appeals*, supra, 333 Conn. 640.

The board argues that this court's decision in *Jaser* v. *Zoning Board of Appeals*, 43 Conn. App. 545, 545–46, 684 A.2d 735 (1996), controls. In *Jaser*, after a house was destroyed by a fire, the owner sought a variance of the setback requirement in order to build a new house on the property. Id., 546. Prior to submitting their variance application, however, the plaintiffs submitted an application to the zoning board of appeals to have the lot declared a nonconforming building lot, and they submitted a survey that showed that a house could be built on the property within the applicable setback requirements. Id. The board denied the variance application, stating the following as its reason: "It was felt by those in opposition that there was no evidence presented to establish a hardship and noted that approval was granted for the nonconforming lot on the basis that a structure to be built would comply with setback requirements." (Internal quotation marks omitted.) Id., 547. After the trial court sustained the plaintiffs' appeal, this court reversed the judgment of the trial court, concluding that "a hardship was not shown because the plaintiffs admitted that a house, even though not the type that they desired, could have been built on the lot while conforming to the setback requirements." Id., 547–48.

In the present case, the federal and state mandated minimum flood elevation requirements combined with the local height limitation have the effect of limiting the height of the home that the plaintiffs seek to build on their property. The plaintiffs maintain that the multiple requirements "severely [restrict] what can be built." They do not argue that they cannot build a single-family residence on their property in the absence of a variance from the building height regulation. Cf. *Mayer-Wittmann* v. *Zoning Board of Appeals*, supra, 333 Conn. 648–49 (applicant established that unusual hardship would result from strict enforcement of height limitation, which would deprive applicant of right to continue using existing, legally nonconforming accessory structure, where such structure could not be rebuilt in absence of either variance from building height regulations or minimum flood elevation requirement). Instead, as the board emphasizes, "the need [for a variance] arises from the plaintiffs' desire to construct a new three-story, 1600 square foot house to replace a two-story, 1500 square foot house."

"A variance is not a tool of convenience, but one of necessity. . . . They are not to be granted when a reasonable use already is present, or plainly is possible under the regulations, but an owner prefers otherwise." *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 716. Moreover, a property owner's personal disap-

pointment in the use of his property does not constitute the legal hardship necessary for the granting of a variance. See *Amendola* v. *Zoning Board of Appeals*, supra, 161 Conn. App. 746 ("[The applicant's] proposed additions reflect personal preference, not hardship, and could be achieved through alternative construction plans that comply with the regulations. Indeed, the mere fact that a conforming structure could be built without the need for a setback variance transforms an alleged hardship into personal disappointment."); *Green Falls Associates, LLC* v. *Zoning Board of Appeals*, 138 Conn. App. 481, 494, 53 A.3d 273 (2012) (plaintiff "failed to show that the inability to build its desired house as a result of the denial of the variance application is anything beyond a disappointment"); *Michler* v. *Planning & Zoning Board of Appeals*, 123 Conn. App. 182, 187, 1 A.3d 1116 (2010) (applicant's "disappointment in the use of the subject property, namely, the inability to build a larger structure," constituted personal hardship and did not form proper basis for board's finding of hardship (emphasis omitted)).

We agree with the board that the record contains no evidence demonstrating that, in the absence of a variance from the height limitation, the plaintiffs cannot build a home on their property that conforms with the federal and state mandated minimum flood elevation requirements.[15] See *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 696–97 (record did not substantiate finding that hardship arose from inability to comply with fire or building codes where applicant submitted no evidence showing that proposed expansion of existing structure was necessary, rather than preferable, course to achieve compliance with code requirements). In sum, the record lacked evidence of hardship originating in the zoning ordinance because the plaintiffs' evidence submitted to the board merely established that they could not build the type of house that they desired while conforming to the height limitation. Thus, although the plaintiffs' proposed home did not increase substantially the square footage when compared to their prior home, the plaintiffs' alleged hardship arises out of their desire to build a certain type of home; see *Jaser* v. *Zoning Board of Appeals*, supra, 43 Conn. App. 548; which is appropriately characterized as personal disappointment.

To obtain the requested variance, the plaintiffs bore the burden of demonstrating, on the record of the proceeding before the board, a legally cognizable hardship. See *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 719–20; see also *Amendola* v. *Zoning Board of Appeals*, supra, 161 Conn. App. 738–39 (applicant has burden of proving existence of sufficient hardship).[16] We conclude that the plaintiffs failed to carry their burden of demonstrating a legally cognizable hardship and, therefore, the board acted properly in denying the variance.

## II

The board's second claim on appeal is that the trial court erroneously concluded that the plaintiffs' proposal qualifies under the exception to the hardship requirement set forth in *Adolphson* v. *Zoning Board of Appeals*, supra, 205 Conn. 710. Specifically, it argues that "[t]he *Adolphson* exception does not apply to the height variance request, because the proposed new structure does not propose to lessen the structure's nonconformity as to height. . . . *Adolphson* does not stand for the proposition that the reduction in one nonconformity allows as a tradeoff the increase in, or creation of, another nonconformity." (Internal quotation marks omitted.) We agree with the board that the present case does not qualify under the *Adolphson* exception to the hardship requirement.[17]

"In cases in which an extreme hardship has not been established, the reduction of a nonconforming use to a less offensive prohibited use may constitute an independent ground for granting a variance." *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 562, 916 A.2d 5 (2007). In *Adolphson* v. *Zoning Board of Appeals*, supra, 205 Conn. 705, the applicants had purchased property located in an industrial district 1 zone, on which property the prior owners had operated an aluminum casting foundry, which was a nonconforming use. The applicants purchased the property with the intention of using it as an automobile repair shop, and sought variances in order to do so, despite the fact that such use was prohibited by the town's zoning regulations in that industrial zone. Id., 705–706. The zoning board of appeals granted the requested variances, and neighboring property owners appealed to the Superior Court, which dismissed the appeal on the ground that "the proposed use for the subject property operating under current regulations as to air pollution and the like would be far less offensive to the surrounding residents than a foundry." (Internal quotation marks omitted.) Id., 706. Our Supreme Court affirmed the judgment of the trial court on the ground that "nonconforming uses should be abolished or reduced to conformity as quickly as the fair interest of the parties will permit—[i]n no case should they be allowed to increase. . . . The accepted method of accomplishing the ultimate object is that, while the alien use is permitted to continue until some change is made or contemplated, thereupon, so far as is expedient, advantage is taken of this fact to compel a lessening or suppression of the nonconformity." (Citations omitted; internal quotation marks omitted.) Id., 710.

In *Stancuna* v. *Zoning Board of Appeals*, 66 Conn. App. 565, 567, 569–71, 785 A.2d 601 (2001), the lot at issue, which predated town zoning regulations, contained a single-family residence in a commercial zone. The applicant intended to construct a new commercial

building on the property and sought a variance of the zoning regulation requiring a twenty foot side yard setback, which the zoning board of appeals granted. Id., 566–67. On appeal to this court following the trial court's dismissal of the appeal, this court recognized the following, citing *Adolphson*: "That a variance will eliminate a nonconforming use constitutes independent grounds for sustaining the granting of a variance." Id., 572. Noting that the variance would eliminate the nonconforming residential use of the property and would permit construction of a building for commercial use in a commercial zone, this court affirmed the judgment of the trial court. Id. In *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 559, our Supreme Court applied *Adolphson* and *Stancuna*, in concluding that a zoning board's decision to grant a variance was proper because it reduced a preexisting nonconforming use of the property to a less offensive use.

The plaintiffs argue that the facts presented in *Hescock* v. *Zoning Board of Appeals*, 112 Conn. App. 239, 962 A.2d 177 (2009), are most similar to those in the present appeal. In *Hescock*, the applicants sought to raze the house located on their property and to construct a new house. Id., 242. They sought a variance of the regulation requiring that new construction "be located 100 feet landward of the reach of the mean high tide." (Internal quotation marks omitted.) Id. The existing house was located forty-four feet from the mean high tide, and the proposed new house would be located forty-seven feet from the mean high tide. Id. The new house would be compliant with all other flood regulations, including the standards concerning base flood elevation levels, and would replace the existing home below the base flood elevation. Id., 242–43, 260. The board approved the variance, stating that the application "as presented—will diminish existing non-conformity and will address and improve flood zone issues." (Internal quotation marks omitted.) Id., 251. On appeal, this court concluded that the board's determination that the new construction would lessen nonconformities was substantially supported by the evidence presented at the hearing, including that the new house would be set farther from the mean high tide than the existing one. Id., 260. It further concluded that the law as set forth in *Vine*, *Adolphson*, and *Stancuna* was applicable to the circumstances, in that there was "substantial evidence that the new construction would reduce and eliminate existing nonconformities and present less of a hazard in case of a flood . . . ." Id., 260–61. Accordingly, the elimination and reduction of nonconformities presented an independent basis for granting a variance.[18] Id., 261.

The plaintiffs argue that they are entitled to the requested height variance under *Adolphson*, *Stancuna*, *Vine*, and *Hescock*, on the basis that their proposed residence would reduce "nonconformities from the pre-

vious structure." Specifically, they maintain that the previous nonconformities included the detached garage in the front yard setback,[19] the shed structure on the property line in violation of the side yard setback, the residence in violation in the side yard setback, portions of the residence in the VE 13 Flood Zone which made it more susceptible to serious flooding, and a finished floor elevation below the flood line. They argue that "[t]he proposed plan consolidated all of the nonconforming structures on the property into one structure, which is to be built flood compliant with federal, state, and Milford regulations." We disagree.

In each of the cases cited by the plaintiff, the applicants sought a variance and their proposal included the elimination of a nonconforming use or conversion to a less offensive nonconforming use; see *Adolphson* v. *Zoning Board of Appeals*, supra, 205 Conn. 710 (variance from regulation prohibiting operation of automobile repair shop justified because such use was less offensive than prior nonconforming use of foundry); *Stancuna* v. *Zoning Board of Appeals*, supra, 66 Conn. App. 569–71 (variance from setback requirement was proper because variance eliminated nonconforming residential use and allowed for conforming commercial use); or the variance the applicant sought itself constituted a reduction or elimination of a presently existing nonconformity. See *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 571–72 (variance from minimum square footage requirement justified because building two houses on two lots constituted reduction in nonconformity of three houses on three lots); *Hescock* v. *Zoning Board of Appeals*, supra, 112 Conn. App. 260–61 (variance from setback requirement for proposed new construction justified by reduction in existing noncompliance with setback requirement and elimination of noncompliance with all remaining flood regulations).

In the present case, however, the plaintiffs' proposed new construction would *create* a height nonconformity where none previously existed. These circumstances distinguish the present case from *Adolphson*, *Stancuna*, *Vine*, and *Hescock*. Cf. *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 728 (applicants' proposed expansion would not result in lesser nonconformity on applicants' property and, therefore, *Adolphson* exception was not applicable). The plaintiffs have provided this court with no authority suggesting that the board was required to grant the requested variance from the height limitation, *which would create a new nonconformity*, on the basis of a proposed reduction or elimination of other nonconformities and compliance with flood regulations. Thus, we conclude that the present case does not qualify under the *Adolphson* exception to the hardship requirement. Accordingly, the trial court improperly sustained the plaintiffs' appeal.

The judgment is reversed and the case is remanded

with direction to render judgment dismissing the plaintiffs' appeal.

In this opinion the other judges concurred.

[1] The board also claims on appeal that the requested variance would affect substantially the city of Milford's comprehensive zoning plan. Because we conclude in part I of this opinion that the plaintiffs failed to establish unusual hardship and in part II of this opinion that the plaintiffs' proposal does not qualify under the *Adolphson* exception, it is unnecessary to reach the board's claim that the plaintiffs' requested variance would affect substantially the comprehensive zoning plan. See *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 296 n.12, 947 A.2d 944 (2008) (declining to address whether proposed residence would affect substantially comprehensive zoning plan in light of conclusion that no unusual hardship existed); see also *Moon* v. *Zoning Board of Appeals*, 291 Conn. 16, 18 n.1, 966 A.2d 722 (2009).

[2] After noting a slight discrepancy between the plaintiffs' measurements and the measurements on the Zoning Location Survey submitted to the board, the court included in its memorandum of decision the plaintiffs' measurements of the lot as "approximately 113 feet long [and] 28.2 feet [wide] along the shore of the Long Island Sound to the east and with 32 feet of frontage on Hillside Avenue to the west."

[3] The zoning regulations also require a minimum lot width of fifty feet and lot depth of seventy feet. Milford Zoning Regs., art. III, § 3.1.4.1.

[4] Exempted from the height computation are roof parapets and turrets of less than three feet, cupolas and domes that do not exceed 15 percent of the roof area, among other restrictions, and church spires and chimneys. Milford Zoning Regs., art. XI, § 11.2.

[5] The Code of Federal Regulations defines "Flood Insurance Rate Map" as "an official map of a community, on which the Federal Insurance Administrator has delineated both the special hazard areas and the risk premium zones applicable to the community. . . ." 44 C.F.R. § 59.1; see also Milford Zoning Regs., art. XI, § 11.2 (containing similar definition).

[6] Section 5.8.2 of the zoning regulations provides, in relevant part: "The areas of special flood hazard identified by [FEMA] in its Flood Insurance Study (FIS) for New Haven County, Connecticut, dated December 17, 2010, and accompanying Flood Insurance Rate maps (FIRM), dated December 17, 2010, and other supporting data applicable to the [city], and any subsequent revisions thereto, are adopted by reference and declared to be a part of this regulation."

[7] The code's definition of "Flood Insurance Study" refers to "[f]lood elevation study," which is defined as "an examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation and determination of mudslide (i.e., mudflow) and/or flood-related erosion hazards." 44 C.F.R. § 59.1.

[8] The code defines "[f]lood elevation determination" as "a determination by the Federal Insurance Administrator of the water surface elevations of the base flood, that is, the flood level that has a one percent or greater chance of occurrence in any given year." 44 C.F.R. § 59.1.

[9] The code defines "[f]reeboard" as "a factor of safety usually expressed in feet above a flood level for purposes of flood plain management. 'Freeboard' tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as wave action, bridge openings, and the hydrological effect of urbanization of the watershed." 44 C.F.R. § 59.1.

As the trial court noted in its memorandum of decision, the plaintiffs originally contended that state regulations required two additional feet of freeboard. They later argued that only one foot of freeboard was required. On appeal, the parties agree that only one foot of freeboard is required.

[10] The plaintiffs filed a previous variance application, which was denied by the board without prejudice in December, 2014.

[11] Specifically, the plaintiffs' requested variances included a "[r]eduction in the (south) side yard setback from 10 feet to 8.46 feet . . . [r]eduction in the (south) deck stairs setback from 8 feet to 4.4 feet . . . [i]ncrease in number of stories from three to four and . . . [i]ncrease in height from 35 feet to 39.5 feet . . . ." (Internal quotation marks omitted.)

As the trial court noted and as the plaintiffs represent in their brief to this court, the requested variance of the number of stories became moot as of a change in the regulations permitting four stories, which became effective in March, 2016. Additionally, the board's counsel recognized before the trial court that the board "had no problem with the first two requested

setback variances." (Internal quotation marks omitted.) Thus, the only issue before the trial court and this court is the board's denial of the requested variance as to the height of the proposed structure.

[12] Although the verbatim meeting minutes attribute this remark to board member Haberman, it appears that another board member was speaking.

[13] See footnote 9 of this opinion.

[14] Our Supreme Court recently issued a decision addressing the unusual hardship required to be shown by an applicant for a variance. See *Mayer-Wittmann* v. *Zoning Board of Appeals*, supra, 333 Conn. 624. While the majority opinion stated that "the tests for unusual hardship and inverse condemnation are one and the same;" id., 642; it did not alter the hardship analysis as it would be applied to this case. The parties had the opportunity, during oral argument before this court, to argue the applicability of *Mayer-Wittmann* to the present appeal, and neither contended that it was controlling.

[15] During the public hearing, board member Soda repeated a suggestion that he had made with respect to the plaintiffs' prior application; see footnote 10 of this opinion; that a change in the type of roof could bring the proposed house within the height limitation. Specifically, he suggested that the proposed shed roof could be changed to a gable roof. Counsel for the plaintiffs represented that he had explored this possibility with Joe Griffith, the chief building inspector for the city, but that it was not permitted under the state building code because of wind concerns.

Aside from the preceding discussion regarding the roof, the only evidence in the record of the effect of the denial of the requested variance is a statement in a document titled "59 Hillside Ave Height [F]acts," in which the plaintiffs represented: "Unless zoning approves a hardship due to the lot size, slope and location in a flood zone they will require us to remove [five feet] from the structure. This will remove one floor from the design which is not forced on any other Milford resident that is not in a flood zone." This representation alone is not sufficient evidence of hardship.

[16] In its principal appellate brief, the board argues that the plaintiffs failed to prove that their hardship was unique because "virtually every lot on Hillside Avenue shares the same characteristics . . . ." The plaintiffs challenge that position by arguing that "[t]he correct standard is whether other properties in the same zone are similar, not other properties in the same neighborhood." (Emphasis omitted.) Because we conclude that the plaintiffs failed to demonstrate the existence of a sufficient hardship, we need not address whether any claimed hardship is unique.

[17] Before the board, the plaintiffs' counsel argued as follows: "[T]he first sheet of the plans we have submitted shows the proposed dwelling. When you compare that to sheet 2 which showed the prior development on the property you can see glaringly that the building area and the lot coverage especially is going to be reduced. The prior development with the shed, the garage and the residence on the property showed the lot coverage being over 70 percent of the property. Our regulations in the R-5 zone permit no more than 65 percent lot coverage and that is going to be what the proposed dwelling will be. So actually right [from] the outset we're reducing or eliminating a nonconformity on the structure, I mean a nonconformity on the property with the proposed structure. Secondly, the other point I wanted to make is that by centering the lot we are requesting side yard variances. I noticed fro[m] the record and the minutes of the prior meeting that didn't pose a great problem to the board when you were considering the application, but I did want to note and make it part of the record that the proposed residence is now going to be centered basically in the middle of the property. It removes a residence that is closer some side yard setback before was 3.6 feet. It had a shed, it was basically right on the property line. It had a garage which encroached upon the twenty foot front yard setback that's required in the zone. So, I think that the overall plan of development for this new residence really cleans the property up and quite honestly reduces and eliminates some prior nonconformities with the plan. So really it all comes down to the height of the building . . . ."

The board implicitly rejected this argument in denying the variance.

[18] We note that *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 555, *Adolphson* v. *Zoning Board of Appeals*, supra, 205 Conn. 710, *Hescock* v. *Zoning Board of Appeals*, supra, 112 Conn. App. 261, and *Stancuna* v. *Zoning Board of Appeals*, supra, 66 Conn. App. 572, in contrast with the present case, all involved a reviewing court's decision to sustain a *board's granting* of a variance.

[19] The board correctly maintains that "the proposed elimination of the

detached garage cannot be considered a reduction of a nonconformity because there is no minimum front yard setback for accessory structures, and therefore no violation." See Milford Zoning Regs., art. XI, § 11.2 (defining accessory building in relevant part as "[a] building which is clearly incidental or subordinate customarily in connection and located on the same lot with the principal building or use"); see Milford Zoning Regs., art. III, § 3.1.4 (containing only side and rear setback requirements for accessory structures).

———————————————